

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | NO. 2:19-CR-159-Z |
| BRAD WILLIAM FANSLER | |

## FACTUAL RESUME

In support of Brad William Fansler's plea of guilty to the offense in Count One of the Information, Fansler, the defendant, Everett Seymore, the defendant's attorney, and the United States of America (the government) stipulate and agree to the following:

## ELEMENTS OF THE OFFENSE

To prove the offense alleged in Count One of the Information, charging a violation of 18 U.S.C. § 371, that is, Conspiracy to Commit Wire Fraud, the government must prove each of the following elements beyond a reasonable doubt:

### Conspiracy to Commit Wire Fraud[1]

*First:*  That the defendant and at least one other person made an agreement to commit the crime of wire fraud, as charged in the Information;

*Second:*  That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

*Third:*  That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the Information, in order to accomplish some object or purpose of the conspiracy.

---

[1] Fifth Circuit Pattern Jury Instruction 2.15A (5th Cir. 2015 ed.)

**Brad William Fansler**
**Factual Resume—Page 1**

### Wire Fraud[2]

*First:*  That the defendant knowingly devised or intended to devise any scheme to defraud, as described in the Information;

*Second:*  That the scheme to defraud employed false material representations, pretenses, or promises;

*Third:*  That the defendant transmitted or caused to be transmitted by way of wire communications, in interstate or foreign commerce, any writing, sign, signal, picture, or sound for the purpose of executing such scheme; and

*Fourth:*  That the defendant acted with a specific intent to defraud.

## STIPULATED FACTS

1. Brad William Fansler admits and agrees that beginning on or about a date unknown and continuing until on or about July 27, 2018, in the Amarillo Division of the Northern District of Texas, and elsewhere, he did knowingly and willfully combine, conspire, confederate, or agree with others, persons known or unknown to the United States, to commit wire fraud, in violation of Title 18, United States Code, Section 1343, with knowledge of the unlawful purpose of the agreement. All in violation of Title 18, United States Code, Section 371.

2. Fansler did knowingly and with intent to defraud, devise, intend to devise, or participate in a scheme to unlawfully enrich Reagor Dykes Auto Group (RDAG), himself, or others, by deceiving Ford Motor Credit Company (FMCC) and fraudulently inducing it to send money to RDAG.

---

[2] Fifth Circuit Pattern Jury Instruction 2.57 (5th Cir. 2015 ed.).

**Brad William Fansler**
**Factual Resume—Page 2**

3. In 2014, Brad William Fansler was hired by RDAG, and he later became the Group Administrative Director.

4. In 2008, FMCC became the floor plan lender for Reagor-Dykes Motors LP (Spike Dykes Ford in Lamesa, Texas). In 2014, FMCC became the floor plan lender for 1) Reagor-Dykes Auto Company LP (the Ford store in Plainview, Texas); 2) Reagor-Dykes Imports LP (the Mitsubishi store in Lubbock, Texas); and 3) Reagor-Dykes Amarillo LP (the Mitsubishi store in Amarillo, Texas).

5. In 2015, FMCC became the floor plan lender for 1) Reagor-Dykes Plainview LP (the Toyota store in Plainview, Texas) and 2) Reagor-Dykes Floydada LP (the Chevrolet store in Floydada, Texas).

6. A "floor plan" is the term used to describe a loan taken out by an auto dealership to purchase its vehicle inventory.

7. On or about February 1, 2018, the Amarillo office of the Federal Bureau of Investigation received information that RDAG was engaged in wire fraud by submitting false information to FMCC in connection with its floor plan loans. The FBI began investigating the allegations and learned that Fansler and his co-conspirators were involved with floor plan fraud with FMCC.

8. Fansler and his co-conspirators received funds for RDAG from FMCC by means of wire communications in interstate or foreign commerce.

9. In June 2018, FMCC conducted an audit of the inventory at the RDAG dealerships. FMCC reviewed the sales information for 150 vehicles and determined that the sales dates reported to FMCC by RDAG for 147 of 150 vehicles did not match the

sales and/or registration dates reported by the Texas DMV and/or other publicly-available sources. On average, those 147 vehicles actually sold 55 days before RDAG paid FMCC, which is not in compliance with its floor plan agreement. In 15 instances, FMCC found where RDAG sold a vehicle and then, after it was sold, floor planned that vehicle with FMCC again, even though it was no longer in inventory, thus obtaining financing payments from FMCC under false pretenses. Because of those findings, on July 26, 2018, and on July 27, 2018, FMCC conducted a surprise audit on several RDAG dealerships, which revealed approximately $40,434,000.00 worth of collateralized inventory that RDAG was unable to produce for inspection.

10. The FBI interviewed multiple current and former RDAG employees who confirmed that the six dealerships, listed above, did in fact submit fraudulent requests for advances on the floor plan loan. The FBI confirmed through its investigation that when RDAG sold a vehicle, and FMCC had previously extended floor plan loan proceeds to RDAG to purchase that vehicle, RDAG had seven days to repay FMCC after the sale. Fansler and the RDAG accounting staff routinely and intentionally failed to make those payoffs, which is referred to as "selling vehicles out of trust."

11. FMCC conducted what were supposed to be surprised audits. However, RDAG would learn in advance when FMCC's quarterly floor plan audits were going to take place, and would disseminate that information to the RDAG's controllers or office managers in the dealerships.

12. The RDAG controllers and office managers, including Fansler, with the help of their office staff, would prepare for the floor plan audits by creating false

paperwork, sometimes referred to as "dummy shucks," on vehicles that were sold out of trust, in order to make it appear as though the vehicles had just recently sold and were not out of trust. Specifically, RDAG's accounting staff would falsify sales dates.

13. When the FMCC-contracted auditors from Alliance Inspection Management LLC (AIM) would arrive on site at RDAG dealerships to conduct the floor plan audits, the RDAG controllers or office managers, including Fansler, would provide the aforementioned false paperwork, or dummy shucks, to the auditors. This gave the appearance that RDAG was not selling vehicles out trust, and, thus, RDAG was passing its audits.

14. RDAG's accounting staff would submit false information by interstate wire communication to FMCC in order to acquire new floor plan funding, which was then applied toward the large payoffs to FMCC after each audit. RDAG's accounting staff would submit requests to FMCC for new floor plan funding for vehicles that had already passed through the dealerships months or years before.

15. RDAG's staff would retrieve files from old car deals and submit the Vehicle Identification Numbers (VIN), via interstate wire communication, to FMCC as though RDAG were buying the vehicles again, when in fact it was not. RDAG's accounting staff referred to this practice as "re-flooring," "fake flooring," or "dummy flooring."

16. FBI agents learned that by the time of the March 2018 and June 2018 audits, and possibly as early as January 2018, RDAG's accounting staff in at least one dealership ran out of vehicles to re-floor. The Snyder dealership, which floored with GM

Financial, sent a list of its Chevrolet inventory to the Floydada dealership to be floored with FMCC. In other words, RDAG obtained a loan from FMCC for the same vehicle that was pledged to GM Financial as collateral for the floor plan loan on that vehicle. RDAG's office staff referred to this practice as "double flooring."

17. FBI agents recovered several emails showing that Fansler and his co-conspirators discussed the fake flooring. Specifically, on January 17, 2018, Fansler emailed employees at the Amarillo Mitsubishi store informing them that he was in charge of the upcoming audit. FBI agents recovered emails that show Fansler instructing others at the Amarillo Mitsubishi on dummy shucks and how not to date them until he gives them instructions. On January 19, 2018, Fansler emailed:

> Big flooring today! Needs as much real first and then cover the rest with "stuff".

Additionally, on January 19, 2018, Fansler emailed four employees at the Amarillo and Lubbock Mitsubishi stores about post-audit fake flooring.

> Need to help the bank out today. Big flooring (as much real as possible) and big deposits.

18. FBI agents reviewed the "wholesale statement" for Reagor-Dykes Amarillo LP (the Amarillo Mitsubishi store) for the billing period July 1, 2018 to July 31, 2018, which shows the July 2018 activity on the Amarillo dealership's floor plan loan. FBI agents picked out from that wholesale statement, for closer examination, six vehicles that Reagor-Dykes Amarillo LP floored with FMCC. These six vehicles were all floored in early July 2018, which was soon after the late June 2018 floor plan audit. The table below shows the vehicle, when the vehicle was floored with FMCC, and the amount that

**Brad William Fansler**
**Factual Resume—Page 6**

FMCC advanced to Reagor-Dykes Amarillo LP for each vehicle:

| VIN | Year & make | Floor date | Amount |
|---|---|---|---|
| XXXXXXXC3FR117711 | 2015 Chevrolet | 7/9/2018 | $36,475.00 |
| XXXXXXXG5FL500364 | 2015 Jeep | 7/9/2018 | $30,325.00 |
| XXXXXXXT3ES104515 | 2014 Dodge | 7/2/2018 | $21,350.00 |
| XXXXXXX84GGA19806 | 2016 Ford | 7/3/2018 | $27,350.00 |
| XXXXXXXF0FKD78551 | 2015 Ford | 7/2/2018 | $38,325.00 |
| XXXXXXX66G5601409 | 2016 Chevrolet | 7/9/2018 | $63,350.00 |

19. Records for IBC account XXXXXXX 846 titled "Reagor-Dykes Amarillo LP" show electronic deposits from FMCC all throughout July 2018. They show up on the statements as "FORD CREDIT DEFT CREDIT." These funds were transferred via wire in interstate commerce.

20. FBI agents learned that the registration information as of March 27, 2019, shows that these same six vehicles were all bought and sold by the Amarillo dealership months prior to RDAG flooring them with FMCC in July 2018. The current registered owners bought these vehicles from Reagor-Dykes Amarillo LP between February 2017 and April 2018. The registration information shows that the previous owner on all six vehicles is "Reagor Dykes, Amarillo, TX." These are six more examples of RDAG submitting fraudulent flooring requests to FMCC and are what RDAG's accounting staff describes as "re-flooring" or "dummy flooring."

21. The actual loss amount for the floor plan fraud is approximately $27,019,211.02. This amount is based on the following:

    a) $13,844,522.70–409 vehicles not in inventory,

    b) $11,616,703.66–352 vehicles sold by RDAG and funded, and

   c) $1,558,484.66–37 vehicles re-floored.

All of the "dummy floored" vehicles previously described are included in the 409 vehicles found to be "not in the inventory."

22. The FBI also recovered emails showing that Shane Smith, RDAG's chief financial officer, and his co-conspirators discussed the fake flooring. Specifically, on March 20, 2017, Smith emailed instructions to submit fake flooring:

> Whatever it takes, we need to floor anything and everything we can even think of to cover payoffs each day...that is going to be the key!!!! That and having seriously huge CIT!!!! The deposits we do each do will most likely cover the checks we write each other!!

On March 21, 2018, Smith emailed these instructions:

> I want us to load up as much as we can on flooring funding and deposits today!!! Huge day. Don't care what you find to floor, just get it all in there!!!

23. Other employees or co-conspirators would email Smith and discuss fake flooring. Specifically, on March 23, 2018, an RDAG employee emailed Smith and asked, "Are we fake flooring again on Monday?" Smith replied that same day:

> Just get them ready and we'll see how we do each day. First each day, enter everything normal/regular that you have and then we'll have some ready if we need to cover any. Your payoffs are not a ton, so maybe we can keep it low or to a minimal on the fluff.

24. The FBI interviewed several witnesses. These witnesses said RDAG was under-capitalized due to its aggressive growth and acquisitions of new dealerships, above-market employee compensation, and unnecessary overhead. As a result, RDAG did not have the necessary capital on hand to make the required large payments to FMCC after floor plan audits.

25. The defendant agrees that the defendant committed all the essential elements of the offense. This factual resume is not intended to be a complete accounting of all the facts and events related to the offense charged in this case. The limited purpose of this statement of facts is to demonstrate that a factual basis exists to support the defendant's guilty plea to Count One of the Information.

AGREED TO AND STIPULATED on this 25th day of October, 2019.

ERIN NEALY COX
UNITED STATES ATTORNEY

_____
Brad William Fansler
Defendant

_____
Everett Seymore
Attorney for Defendant

_____
JOSHUA FRAUSTO
Assistant United States Attorney
West Texas Deputy Branch Chief
Texas State Bar Number 24074228
500 South Taylor Street, Suite 300
Amarillo, Texas 79101-2446
Telephone: 806-324-2356
Facsimile: 806-324-2399
E-mail: joshua.frausto@usdoj.gov